## DELAWARE & HUDSON CO. v. VAN DERPOOL.

(Circuit Court of Appeals, Third Circuit. October 6, 1923.)

No. 2959.

1. **Master and servant ⬅➝301(4)—Railroad not liable for injury by train controlled by another railroad.**

Where the crew of a train which struck plaintiff's husband at a crossing were hired by and received their pay from defendant railroad, but at the time of the injury, pursuant to an operating contract, the crew and train were under the control of and operating the train on the line of another railroad, and that railroad company paid defendant company a reasonable rental for this equipment and a proportional share of the operating expenses, defendant was not operating the train, and hence was not liable for the injury.

2. **Master and servant ⬅➝301(4)—Servant may be transferred to the service of another.**

A servant in the general employ of one may be so loaned or transferred to another as to become for the time the latter's servant, with all the legal consequences of the new relation.

Davis, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by Ida L. Van Derpool against the Delaware & Hudson Company. Judgment for plaintiff, and defendant brings error. Reversed, and a new venire awarded.

John Lewis Evans and John Hampton Barnes, both of Philadelphia, Pa., and Edward T. Noble, of Scranton, Pa., for plaintiff in error.

Owen J. Roberts, of Philadelphia, Pa., and Edwin Booth, of Washington, D. C., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. [1] This is a grade crossing case. It was brought by the plaintiff against the Delaware & Hudson Company, a corporation of the State of New York, to recover damages for the death of her husband caused by a train, owned by the Delaware & Hudson Company, striking an automobile in which he was riding, at a time when the train was being operated over the tracks of the Napierville Junction Railroad Company, a corporation of the Province of Quebec. The action is based on negligence of the engineer in failing to give warning of the approach of the train. Proof that the Delaware Company was operating the train turned on the question whether the engineer was its servant because in its general employ, or was the servant of the Napierville Company because in its special employ at the time of the accident. The learned trial judge regarded this a controverted question of fact and submitted it to the jury. The plaintiff had a verdict. The defendant brings the case here by writ of error, assigning many errors in the trial. The one that has given us most concern is whether error was involved in the court's refusal to give binding instructions for the defendant on its contention that there

⬅➝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was no evidence in the case from which the jury could validly infer that the train when it inflicted the injury was being operated by the corporation sued.

As we read the record the evidence on this issue is not in dispute. We are concerned only with its permissible inferences. These depend mainly on the relations of the two railroad companies.

The lines of the Delaware Company extend from points in Pennsylvania to the northern boundary of New York. Seeking entrance into Canada—territory beyond the state under whose laws it was incorporated—the Delaware Company acquired the stock of the Napierville Company, a corporation organized under the laws of the Province of Quebec. The higher corporate officials of this company are also officials of the Delaware corporation, but each has its own separate operating force. The road of the Napierville Company is equipped and, excepting for the moment the trains in question, it is operated as a distinct transportation entity. It owns a line of 27.25 miles; it has its own maintenance of way department, master mechanic in charge of maintenance of equipment, superintendent under whose direction freight trains and (at least) passenger way-trains are operated, its own station agents, section gangs, etc., all employed and paid by itself. Like other roads it asks and receives its proportion of charges for all traffic passing over its line from beyond.

The Delaware Company maintains through passenger service from New York to Montreal by companion trains leaving opposite termini at about the same time and passing over lines of its own and lines of other companies. The New York Central Railroad Company handles a northbound train by its own crew from New York to Albany or Troy. The Delaware Company picks up the train at one of these points and, by a crew of its own, operates it over its own line to the international boundary at Rouses' Point Junction; thence it passes on the line of the Napierville Junction Railroad Company over which, by the same crew but under a contract presently to be mentioned, it is carried to Delson Junction where it is transferred to the tracks of the Canadian Pacific Railway Company and, still by the same crew but under another contract, it is run into Montreal. This order, reversed, is pursued by southbound trains. It was one of these trains that ran into an automobile at a grade crossing near La Colle, in the Province of Quebec, killing the plaintiff's husband and three others.

In order to fix liability upon the Delaware Company, the defendant, by proving that the engineer was its servant and that the train was, therefore, in its operation and control, the plaintiff introduced in evidence a contract then in force between the Delaware & Hudson Company and the Napierville Junction Railroad Company.

This contract, made, evidently, to carry into effect the through passenger service offered by the Delaware Company, discloses the manner in which that service is in part rendered and the relation of the two carriers thereto. Its terms, relevant to this case, show that—

The Delaware Company agrees to furnish the Napierville Company at the intersection of their lines "a number of trains, including engines, cars and train crews * * * sufficiently equipped and manned for immediate operation over the railway of the Napierville Company to enable that company to

292 F.—44

render passenger service upon its line"; that "the Delaware Company agrees to accept such trains back from the Napierville Company upon delivery at the said international boundary line at the end of their respective runs"; that "the Napierville Company shall have the entire charge of the said trains while on its rails  *  *  *  and shall operate the same for its own purposes and the traffic shall be that of the Napierville Company and under its absolute direction and control"; that "the crews of such trains, while they are upon such line of the Napierville Company, although paid in the first instance by and rendering a portion of their services to the Delaware Company, shall for all purposes be regarded as the employés of the Napierville Company and shall be governed by its standard rules in the movement and handling of such trains and engines"; that "the proportion of the entire wages of the crews of such trains, which shall be the proportion of their services which is rendered while upon the said line of the Napierville Company, and shall be charged to the latter company and paid by it to the Delaware Company"; that "the Napierville Company shall pay to the Delaware Company the amount of wages above mentioned, plus a reasonable cost or rental value of the cars· and locomotives used, and of the coal, oil, and other material furnished and used"; that "the Napierville Company shall be responsible for all loss or damage to such trains and to their crews and to passengers and other third parties,  *  *  *  while such trains are upon its line and under its control, and shall indemnify and save harmless the Delaware Company  *  *  *  from and against all claims and demands by reason thereof"; that "all repairs to said trains when required while on the rails of and under the control of the Napierville Company shall be made by the latter but the cost thereof shall be chargeable to the Delaware Company and paid by it unless such repairs shall have been rendered necessary by accidents or the acts of any member or members of the crews of said trains or other employés of the Napierville Company while said trains are on the rails of the Napierville Company or under its control, in which case the repairs shall be borne by the latter company"; all payments by either party to the other party shall be made monthly on a named date.

This contract, as we have said, was put in evidence by the plaintiff, under the burden which the law placed upon her, to prove that the train which killed her husband was operated by the defendant, the Delaware Company. Being her evidence, it is binding upon her for what it proves. Yet, later, the plaintiff maintained, and the learned trial judge charged the jury, that "she was not bound by the contract because she was not a party to it and had no notice of it." There would be no infirmity in this position if contractual rights or liabilities were involved. But this is a negligence case where the issue is whether at the time of the accident the relation of master and servant existed between the defendant and the engineer. By that relation, whatever it was, and without regard to whether she was a party to its creation, the plaintiff is bound and on it her right to recovery depends.

Turning to the writing, it is clear that it is an operating contract, not a trackage contract. If the plaintiff had rested on it alone for proof of the operation of the train by the defendant, she could not have prevailed, for the contract indicates that the alleged negligent engineer was at the time in the employ of the Napierville Company and that, in consequence, the offending train was being operated by that company. "If," as the learned trial judge correctly said in his charge, "the operation of this particular train at that particular time was as set out in the agreement, then the defendant company would not be answerable, but," continued the learned trial judge, "if it [the Delaware Company]

was the operator of that particular train, then it would be answerable, no matter what was in the agreement." This instruction followed another to the effect that "the controlling thought is not how it was agreed to be done but how it was done."

[2] Starting with the contract which the plaintiff offered in evidence, we have followed this inquiry by searching the record for evidence from which it can be gathered that the train was operated otherwise than agreed upon. If there is such evidence, there was, concededly, a question for the jury. If there is no such evidence, the case stands on the plaintiff's proof of the contract showing operation by the Napierville Company, and, accordingly, there was no question for the jury. In looking for evidence on this question we have kept in mind that the law recognizes that a servant, in the general service of one, may be so loaned or transferred to the service of another as to become, for the time, the latter's servant with all the legal consequences of the new relation. When injury results from the negligence of an employé who is a servant in the general employ of one and in the special employ of another, the central question is, which of his two employers was his master at the very time of his negligent act. As an aid to answering this sometimes difficult question, the Circuit Court of Appeals for the Sixth Circuit in Byrne v. Kansas City, Ft. S. & M. R. Co., 61 Fed. 605, 9 C. C. A. 666, 24 L. R. A. 693, has laid down two lines of inquiry: (a) Whose work was the servant doing; (b) under whose control was he doing it?

Initially, these questions are answered by the contract itself. From its terms, as well as from its tenor throughout, it appears that the train was operated by the Napierville Company "for its own purposes," "under its absolute direction and control." The questions are further answered by oral testimony, not here repeated, showing that the parties operated under the contract according to its terms. The evidence on which the plaintiff relies to prove that the contract was not performed as written and that the Delaware Company, not the Napierville Company, was actually operating the train at the time of the accident, is limited to several matters which we shall state and discuss separately.

The train which struck the automobile, the plaintiff represents, was "train No. 2, a scheduled train of the defendant running from Montreal to Albany under timetable rights requiring no orders." Admittedly, this train belonged to the defendant and was turned over to the Napierville Company, as the contract intended, to be operated over its line. After starting, it did run on the time schedule of the Napierville Company. In doing so we fail to discover the significance which the plaintiff ascribes to it. But, whatever that may be, this train after reaching the Napierville road and before taking up its southbound movement, was started on the order of the superintendent of that road. In our opinion this testimony sustains rather than refutes the manner of operation agreed upon by the contract. Continuing, the plaintiff says:

"Which train was manned, operated, controlled and in charge of the employés of the defendant (the Delaware Company)."

It was manned by the employés of that company as agreed upon in the contract. Being so manned, it was delivered to the Napierville

Company and under orders of that company's superintendent the same men ran the train to the next connection. But, we think, it begs the question to say that the men, in the circumstances, were employés of the defendant. Further, the plaintiff says that these men were "selected, hired [and] paid * * * only by the defendant." It is true they were selected and hired by the defendant as provided by the contract, but this does not fix liability on the defendant if, before the accident, the men had been transferred from its general employ to the special service of the Napierville Company. Literally, they were "paid" by the Delaware Company. But the evidence shows that in the periodical financial adjustments between the two companies reimbursement by the Napierville Company to the Delaware Company entered. The main contention of the plaintiff is that the men so selected, hired and paid were "subject to discipline and discharge only by the defendant." This, too, is not wholly correct. Being in the general service of the Delaware Company, that company had sole power to discharge them when in its service. When they came into the special service of the Napierville Company, the latter company, of course, did not have power to discharge a servant in the general employ of another master. It did, however, have power for any reason of its own to refuse thereafter to permit an objectionable servant in the general employ of the Delaware Company to re-enter upon its line. On the other hand, there is nothing in the evidence which shows that the Delaware Company had power to discharge one, though a servant within its general employ, while actually in the special service of the Napierville Company. The arrangement between these two companies would, from its very nature, seem to indicate that neither had a right to discharge men while employed in the service of the other. At all events there is no evidence to the contrary. Therefore the right to discharge, or the lack of it, does not, in our opinion, determine the character of the control of the operation of the train so manned. Operation of the train by the Delaware Company over the line of the Napierville Company is urged by the plaintiff on the claim that the two companies were jointly interested in the through passenger traffic. Financially, both were interested because of anticipated profits inuring from such service. Operatively, they were successively interested. It is only with the operative aspect of the relation that we are concerned in this action.

Concluding, the plaintiff maintains that "the locomotive and coaches of the train were the property of and bore the name of the defendant" and the men wore its uniform. This is true, and it is entirely consistent with what was intended by the contract. It was agreed that the train should be that of the Delaware Company and the men should be men furnished by it, both to be handled by the Napierville company, on this link of the through movement, for its own purposes and under its own absolute direction and control. There is no evidence that anything else was done.

Briefly stated, this is all the evidence we have found on which the plaintiff relies to prove operation and control of the train different from that agreed upon by the parties. Without repeating the very thorough argument of counsel, it is sufficient to say that, in our opinion, this evi-

dence fails to disclose that the train was not operated as provided by the contract. Therefore it follows there are no facts which sustain the finding by the jury that the train was operated by the defendant. Regarding this case as ruled by the law of Byrne v. Kansas City, Ft. S. & M. R. Co., 61 Fed. 605, 9 C. C. A. 666, 24 L. R. A. 693; Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480; and Central R. Co. of New Jersey v. De Busley (C. C. A.) 261 Fed. 561, we are constrained to hold that, on the evidence, it should not have been submitted to the jury. This makes it unnecessary to consider the other assignments of error.

The judgment below is reversed and a new venire awarded.

DAVIS, Circuit Judge (dissenting). The District Court is reversed on the ground:

"That there was no evidence in the case from which the jury could validly infer that the train when it inflicted the injury was being operated by the corporation sued."

The learned trial judge charged, and this court has declared, that if the particular train at the time and place in question was operated in strict accordance with the contract between the defendant and the Napierville Company, the plaintiff cannot prevail, for according to the contract alone the train crew was wholly the servant of the Napierville Company, in its sole employ and under its exclusive control. But, as the jury was charged, the operation of the train, and the consequent master of the crew, depended upon, "not how it was *agreed* to be done, but how it *was* done." This court, in commenting on this phase of the charge, said that if—

"the train was operated otherwise than as agreed upon, * * * there was, concededly, a question for the jury. If there is no such evidence * * * there was no question for the jury."

Addressing itself to this question, the court said:

"The main contention of the plaintiff is that the men so selected, hired and paid were 'subject to the discipline and discharge only by the defendant.' This too, is not wholly correct. Being in the general service of the Delaware Company, that company had sole power to discharge them when in its service. When they came into the special service of the Napierville Company, the latter company, of course, did not have power to discharge a servant in the general employ of another master. It did, however, have power for any reason of its own to refuse thereafter to permit an objectionable servant in the general employ of the Delaware Company to re-enter upon its line. On the other hand, there is nothing in the evidence which shows that the Delaware Company had power to discharge one, though a servant within its general employ, while actually in the special service of the Napierville Company. The arrangement between these two companies would, from its very nature, seem to indicate that neither had a right to discharge men while employed in the service of the other. At all events there is no evidence to the contrary. Therefore the right to discharge, or the lack of it, does not, in our opinion, determine the character of the control of the operation of the train so manned."

Somebody surely had authority to discharge the engineer at the very time and place of the accident, and that somebody was the master whose servant the engineer at the time was. Mr. Harry F. Burch,

assistant to the general manager for transportation of the defendant, whose department had charge of the employment and discharge of engineers, firemen and conductors, testified, first, that the superintendent of the Napierville Company had the right to discharge members of the crew on defendant's train while on the Napierville Company's tracks; but he later testified that what he meant was that he could report any infraction of the rules of the Napierville Company, justifying discharge, to the defendant company, which had authority to "relieve them [members of the crew] from service." It might be inferred from the contract, though it does not in terms so state, that authority to discharge members of the crew of defendant's trains while being operated on the tracks of the Napierville Company rested wholly in its superintendent. But according to the testimony of Mr. Burch, the superintendent as a matter of fact did not have that authority; the authority to discharge rested solely in the defendant company. Here was a plain conflict in the evidence, and it was the province of the jury to determine whether the operation of trains was as it was agreed to be done or otherwise, and it found, under proper instructions of the court, that it was otherwise. The evidence as a whole is sufficient to justify the conclusion of the jury that the defendant was the master of the engineer while he was employed in the "special service" at the time of the accident, and it alone had authority to discharge him at that time. In reaching a contrary conclusion, we are invading the province of the jury.

This should not be done, and I therefore think that the judgment of the District Court should be affirmed.